Joseph S. COOK & Amanda R. Cook, Appellants,

v.

John RATLIFF, Appellee.

No. CA 08–732.

Court of Appeals of Arkansas.

Feb. 11, 2009.

John D. Bridgforth, P.A., by: John D. Bridgforth, Forrest City, for appellants.

One brief only.

DAVID M. GLOVER, Judge.

This is a prescriptive easement case. Appellants, Joseph and Amanda Cook, appeal from an order that was not filed until December 14, 2007. The notice of appeal was filed on January 11, 2008. In the order, the trial court determined that appellee, John Ratliff, proved that he had used an access road across appellants' property in a manner and frequently enough to establish an easement by prescription. The trial court permanently enjoined appellants from blocking appellee's access across the easement, which was described and set in the order as twenty feet wide. Appellants raise two points of appeal: 1) the trial court erred in finding appellee John Ratliff established a prescriptive easement by adverse possession over lands now owned by appellants Joseph Cook and Amanda Cook, and 2) the trial court erred in restricting cross-examination of appellee John Ratliff at trial.

Finding merit in appellants' first point of appeal, we reverse and dismiss without the necessity of reaching the second point.

The gist of appellants' argument under their first point is that the trial court clearly erred in finding that appellee proved an easement by prescription because appellee did not prove any overt action that would make clear to appellants that appellee was exerting an adverse use and claim to appellants' property. We agree.

*Applicable Law*

The use of unoccupied and unenclosed lands for passage is presumed to be permissive until those using the way, by their open and notorious conduct, apprise the owner that they are claiming it as of right. *Stone v. Halliburton*, 244 Ark. 392, 425 S.W.2d 325 (1968). Use which is permissive in its inception can never ripen into an adverse or hostile right no matter how long continued unless the statutory period has elapsed after notice of the adverse claim has been brought home to the owner. *Id.* Some act or circumstance, in addition to, or in connection with, the use of a way across unenclosed lands of another and tending to indicate that the use was not merely permissive is required to establish a right by prescription. *Id.*

A prescriptive easement may be gained by one not in possession of the land by operation of law in a manner similar to adverse possession; like adverse possession, prescriptive easements are not favored in the law because they necessarily work corresponding losses or forfeitures in the rights of other persons. *Carson v. Drew County*, 354 Ark. 621, 128 S.W.3d 423 (2003). The statutory period of seven years for adverse possession applies to prescriptive easements. *Id.*

The determination of whether a use is adverse or permissive is a fact question, and former decisions are rarely controlling on this factual issue. *Id.* A trial court's finding of fact will not be reversed unless it is clearly erroneous. *Id.* In reviewing a trial court's findings of fact, we give due deference to that court's superior position to determine the credibility of the witnesses and the weight to be accorded to their testimony. *Id.* Disputed facts and determinations of witness credibility are within the province of the fact-finder. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been committed. *Id.* It is this court's duty to reverse if its own review of the record is in marked disagreement with the trial court's findings. *Id.*

### Appellee's Case

The evidence was clear that appellants' land was unoccupied, unenclosed, and unimproved, making appellee's use of the "roadway" across it presumptively permissive unless appellee made it clear to appellants that his use was adverse. The testimony presented by appellee in support of his claim for a prescriptive easement follows.

John Aldridge, a surveyor, testified that he prepared a survey for appellee in 1993; that in preparing the survey, he drove from "the yellow brick road" (County Road 409) across the Weaver property (predecessors in title to appellants) and a portion of the Sykes property to appellee's property; and that he was driving across an "old wood road, a logging road type thing." He said that the road terminated at the old home place, which was on appellee's property; that the road was passable if it was dry; and that the Weaver/Sykes road was the primary access they used to get into appellee's property. He described the Weaver property as unenclosed and uninhabited; that the road in question was an old logging road and that it washes out when it rains; that when it was wet, it was not passable without a four-wheel drive; and that in the survey, he made a provision for an easement over Effie Clay's property (north of appellee's), but not over the Weaver property on the east.

Don Farmer testified that he did some work for appellee about ten years ago whereby he took a bulldozer and cleared an existing old road that went to a farmhouse; that the road was "kind of growed up" when they got there; that they worked on the whole road and had to knock down little saplings; that prior to working on the road, one could not drive a pickup truck into appellee's property; and that he worked on the road about three or four hours. He testified that to his knowledge, the property surrounding the road was unimproved and uninhabited; that it looked as if someone might have used the road for hunting, but otherwise, it would have been impassable in a vehicle; that he did not put any gravel down; that he did not see any asphalt or concrete on the road; that there were "ruts and stuff"; that if someone does not build up a road correctly and put good materials on it, it will wash out forever; that the road washed out every year; and that the work he did was just for a quick fix.

Leo Goodwin testified that his family formerly owned the property currently owned by appellee; that it joins the Sykes place and Clay place; that to get to his family's property they used the road on the Clay farm after the other one got so bad, they could not travel it; that "it was growed up and washed out"; and that they used the road from the Clay property, which went around the edge of the Clay place down the Goodwin (appellee's) prop-

erty. He said that there was another road into the property but that they never used it; he said that the other road was "growed up" when he got big enough to know; and that it was on the east side of the Clay place. He said that his uncles lived on the east side of the place; that they got in and out of there on their feet; and that they did not have a road. He said that his family never logged the property but that they had farmed in there; that they had tractors and a trailer; that they never took the tractor and trailer out on the east side; that there might have been a trail over on the east side but it did not look like vehicles had ever been down it; and that the last time he was there was twenty years ago when he moved his grandmother to a nursing home and that on that occasion they went around the edge of the Clay place. He stated that he was 62 years old; that he had gone to the Goodwin/appellee's property since he was five or six years old; that his family went around the Clay side on the edge of the woods on the Clay property; that when they sold the place, that was the only way to get back there; and that there was a pig trail but you could not drive a full-size vehicle on it.

Alan Barnes testified that he is in the logging business; that he cut timber for appellee on property that was west of appellants' property in 2005; that he accessed that property through a road off County 430 back to a little house; that it crossed the appellants' property; that he could not drive a pickup truck down there for the "washout and things in it"; that he basically went through and "just pushed the top off and filled the washouts in"; that the road came to a gate that opened up on to a little pasture where the old house was; that he worked on appellee's property cutting the timber for about a month or more; and that he hauled the logs out on the same road with an 18-wheeler truck. Barnes said that appellee told him there was an easement across the Clay property and he was in a lawsuit with them, so he would have to come in from the other side, the west side. Barnes testified that if it was not for the washout, a person could have gotten a pickup down the road; that he had to push some honeysuckle and saplings out of the way; that he was there in the summertime and it was dry; that he had to fix the washouts before he could drive down the road; that before he got there with his bulldozer, he could not drive down it; that appellants' property was unenclosed, unimproved, uninhabited; and that one could tell it was not a traveled road.

Appellee rested, and appellants moved for a directed verdict, which was denied.

### Appellants' Case

Appellants began their case with the testimony of King Calvert, who testified that he was familiar with the property of both parties; that for a six to eight-month period about five years ago, he had to use an alternate route to get to work because a bridge on County Road 409 washed out; that in doing so, he passed by the appellants' property two or three times a week when the weather was nice; that no one lives on appellants' property; that it was unenclosed and unimproved; that the "road" was not a road; that he could not negotiate it in a pickup; that he called it a pig trail; that he had not traveled that area in the last eleven months; that there was an opening off the county road (430) onto the Cook/appellants' property, but that no one used it; that it "was just not possible there was a road there and I didn't know it"; that he did not see any vehicles come in and out of there; that he did not drive in and out of there; and that he knew appellee and had never seen him on either of the county roads.

Danny Parsons testified that he is personally familiar with the parties' properties; that he hunts on the north side of appellee's property; that he observed appellee going in and out of his property; that appellee took the route in the northwest corner of his property, which was off Effie Clay's property; that he started hunting in that area in the fall of 1996, which was about ten years ago; that he remembers the old logging road; that he thought a bulldozer went out there in 2005 and pushed some dirt out; that in 2005, the appearance of the property changed; that before then it was a game trail or logging road "with saplings and stuff growed up in it"; that by saplings, he meant small trees, probably six inches in diameter; that between 1996 and 2005, it was not possible to drive a truck or regular sized vehicle through that old logging road; that he drove on County Road 430 to about County Road 409; that he did not drive on the old logging road in his pickup because it was impassable; that he has not noticed anything having been done to the road since 2005; that since then it has gotten very deep "washouts"; that saplings are starting to grow back; that a person could not drive a pickup truck through that area without tearing it up; and that the county has not maintained it. Parsons explained on cross-examination that his observations from 1996 to 2006 were what he observed from the county road; that after appellants bought the property in 2006, he went out there but prior to that he had not been down the road across the Weaver/appellants' place; that he could observe the entrance from County Road 430; that he never saw a bulldozer; that he has never been on appellee's property; that he saw appellee come in through the Clay property; that the road in question never looked maintained to him; and that he did not know if appellee worked on the road or if his family went out there and planted food plots and worked on appellants' property. On redirect, Parsons stated that between 1996 and 2006, he had occasion to travel County Road 430; that from County Road 430, looking west onto the Weaver/appellants' property, one cannot see very far; that it is all in woods; that he never noticed an opening; and that from County Road 430, looking at the old logging road, he could see saplings grown up in it from 1996 on.

Lee Fesmire testified that he is in the real estate business; that he is familiar with the appellants' property; that the predecessors listed it with his agency for five years; that he had shown the property several times and "been all over it"; that he had even hunted it a few times; that there were some old two-wheeler trails there, like old logging roads from years ago; that the only road was County Road 430; that the old logging road looked like it was grown up; that he did not try to drive his vehicle on it; that he drove a four-wheel-drive pickup; that he backed off County Road 430 onto this logging road, but you could not get across, "you'd be stuck"; that there was no traffic on the logging road; that the Weaver/appellants' property was unenclosed, unimproved, and uninhabited; that he assumed someone took a bulldozer and made a road in 2005 because he was there last Christmas and was surprised to see the changes; that he knew the Weavers had not done it; that he does not know the current condition of the road because he has not been there in a year; and that the logging road stayed washed out. He explained that his personal contact with the property was probably in 2002, 2003; that he observed it for three or four years; that he did not know what it looked like in 1993; that in 2003 he could drive a four-wheeler from the county road to the Weaver property line; and that a

four-wheeler is made for rough roads or paths.

Tommy Hollowell testified that he owns eighty acres located a quarter mile or less from the Weaver/appellants' property; that he is familiar with the old Weaver property; that the last time he went down the logging road was on a horse; that a person could get down it on a four-wheeler; that he was out there about four years ago; that he runs cattle on the east side of County Road 430; that he has never seen a truck or any kind of vehicle on the old logging road; that he had seen appellees park on County Road 430, but he had never seen anybody able to traverse the road in a vehicle; that when he rode the horse out there four years ago, trees had grown up considerably in the path he used to walk down; that he wanted to see the old house that used to be there; and that he had to get off the horse and walk down a little ways to see it; and that he never considered it to be a road, but rather a trail.

Appellant Joseph Cook testified that he contacted Mr. Fesmire about the Weaver property in 2003; that he and his brother walked the property and found corner stakes; that it was unenclosed, unimproved, and uninhabited; that they walked the property numerous times; that the main county road was 430; that other than the county road that splits the property there was no other vehicle-worthy road on the property; that there was no road on the property in 2003 and 2004; that there were several small trail paths out there but nothing you could pull off the county road onto with a vehicle; that there is an incline approximately four or five feet on County Road 430 to the logging road or trail; that "it washed out bad there"; that there were trees six to eight inches in diameter growing in the trail; that some of the trees were eighteen- to twenty-feet

tall; that a person could ride a four wheeler through; that the property changed greatly in 2005; that he did not purchase the Weaver property until 2006, but that he purchased forty acres south of it before then; that he noticed in 2005 that it went from a trail through the woods to a thirty-foot wide road; that he saw vehicles and logging equipment coming in and out of the road; that today, a person would need a good four-wheel drive to access the road; that since they completed logging in 2005 to the present, the road has deteriorated, washing out again on both sides; that he took pictures in October 2006; that the pictures were taken from the logging road; that the photographs demonstrate the size of the trees that are in the trail; that he walked from County Road 430 west and took pictures of each pile of brush and each tree that was pushed out of the road to gain access across his property; that the Sykes property is contiguous with appellee's property; that the Sykes have more than one access to their property; that the Sykes' first access comes off County Road 404 which corners into County Road 409 onto County Road 404; that County Road 404 is the road Mr. Calvert was talking about that had the bridge washed out; that County Road 409 goes over to County Road 430; and that Sykes' second entry has a gate and goes from County Road 404 to appellee's property.

Mr. Cook explained that since 1996, he had seen appellee and his son-in-law, Scott Hickman, use the Clay road; that the Clay road leads from County Road 409 back to what used to be the Goodwin property and is now appellee's property. He said that to go from his property to appellee's property, one had to cross the Sykes property. He said that he has a gate on his property that is contiguous to County Road 430; that pictures taken in October 2006 show the washout next to the gate; that the ruts were thirty-six to forty inches deep at that

time; that he has not seen the back side of the property since early November; that the road was not passable in 2003 when he first saw it; that it became passable in the summer of 2005 when the Barnes Logging Company came through; and that it is no longer passable by regular vehicle but that an all-terrain vehicle could go down the road.

On cross, Mr. Cook explained that he did not own any property adjacent to appellee in 1996; that he did not go on the Weaver or the Sykes property in 1996; and that he first entered the property in 2003. He testified that in 1996 when he first went out there, he saw appellee use the Clay access; that he first saw him use the access on the other side (east side) in 2005; that appellee told him in the hunting season of 1996 that he was using the Clay access because the access on the other side of the property was washed out; that he had no knowledge if appellee used the east-side access in 1997, 1998, 1999, 2000, or 2001; that appellee and his family got on their property off county road 404, off the Sykes property; that he placed the T-posts on the property line between his property and the Sykes property in 2006; and that before he did that, there was nothing blocking the road.

On redirect, Mr. Cook testified that in 2003, he had been by the Weaver/appellants' property many times on County Road 430; that from 430 to the property line between the Weaver and Sykes properties in 2003, there were brush, weeds, honeysuckle, blackberry bushes, briar bushes, and numerous sized trees, from one to nine inches in diameter and six to thirty feet tall; and that for five to six years prior to 2003, regular vehicles could not have traversed the road.

## Appellee's Rebuttal

After appellants rested, appellee Ratliff in rebuttal testified that in 2003, he did not observe any saplings of the size described by Mr. Cook; that he drove down the road in 2003 in a Suburban four-wheel drive; that he put up a gate on his property in the 1990s; that he first observed what appeared to be tracks in the road in 1995 and that in response, he erected the gate; that he has used the Weaver/appellants' property every year since he has been there, thirteen years; that it was never a pig trail or path, it was a road; that he had Don Farmer clean up the road in 1994; that he worked the road every year, using dozers and tractors with gradeboxes, filling holes; that he missed one year; that he never told Mr. Cook that he was not using the access on the other side; and that he told Cook to get off the place, that he was trespassing.

On cross-examination, Ratliff stated that he tried to get an easement over the Clay and the Weaver property "because you need two different ways in"; that the first time he was brought in to look at the property, he was taken over both the Clay and Weaver property; that he used both sides for access; that he has not been on the Clay property since 2004; that he still claims an easement across the Clay property; that he does not know if the Weaver/appellants' property is unenclosed; that he put a gate on his own property, not on the Sykes or Weaver property; that "the road ruts out every year" and he has to fix it every year; and that some ruts are as deep as your knee.

## Final Rebuttal

In final rebuttal by appellants, Mr. Cook testified that he has known about the Weaver property since 1996; that he has never seen any repairs to the road; that from 1996 forward, no one could have driven a vehicle on the land in the condition that it was in; that he was testifying about

the "mouth of the road" since 1996; that he did not know about the rest of the road until 2003, any farther than he could see from County Road 430. He said that from 1996 to 2005, a person could probably see sixty to seventy-five yards into the brush off County Road 430; that after the timber company was there in 2005 and cleared the road out, a person could see farther because there would not have been "trees and brush and stuff" growing up in the road. He stated that there has been a road there since 2005; that prior to that time, the road had not been a useable road; that there was a four-foot cut in the road; and that it went up over the hill, not through the hill. He said that the Barnes timber cut was in 2005, prior to his ownership; that the pictures of his property taken from the Sykes property showed what his property was like in October 2006 after the bulldozer came through in 2005.

### Opinion Letter

In her letter opinion dated January 23, 2007, the trial judge summarized the above testimony as follows:

> According to the testimony of Plaintiff and his witnesses they have used this road since it was purchased by Plaintiff in 1993. Rusty Ratliff, Plaintiff's daughter, specifically stated permission for this use was never requested of the Weavers, the Defendants' predecessor in title, and no effort was made to conceal their use of the road.
>
> The Plaintiff's property was used for recreational and hunting purposes since purchase. Due to the topography of the land, when Plaintiff and his family or guests wanted to access the west side of the Plaintiff's property, they used this access road off County Road 430. There are no habitable structures located on it or utility services provided to the area. Scott Hickman, Plaintiff's

son-in-law, also testified to his personal use of the roadway for a period of ten (10) years. In addition to the hunting and other recreational purposes testified to by Plaintiff and Rusty Ratliff, Scott also used Plaintiff's property for trail riding. According to Scott, he was on the property at least once a month until deer season, then he was on it more frequently.

> According [to] these three (3) witnesses, in addition to the use of this roadway across the Weaver, now Cook property, they have done maintenance on the road. A view of the land, both from the pictures and the on-site visit, indicates the area at the entrance to Defendant's property is difficult to cross when the area is wet. According to Plaintiff, each year he did bulldozer work on the road to make it passable. No gravel or concrete was ever placed by Plaintiff on Defendants' property however he did use the dozer to smooth out the ruts in the road. Ricky Milton testified, in exchange for hunting privileges, he cleaned off the road. Don Farmer testified about 10 years ago, he was hired by Plaintiff to make the road passable. According to Mr. Farmer, prior to him performing his work, he could tell the road had been used because the road was gutted out in places. Alan Barnes testified he was hired by Plaintiff in about July 2005 to log timber on his property. Mr. Barnes utilized the disputed road for this purpose.
>
> Mr. Barnes stated an old road was present, however one could not drive a pickup on it due to the washouts. Prior to commencing cutting timber, Mr. Barnes took about 45 minutes filling these washouts to make the road passable. There were also some limbs and saplings he had to push out of the way in order to get his 18–wheeler truck down the disputed road.

Defendants' witnesses dispute the maintenance of the road by Plaintiff or his agents. According to King Calvert, approximately 5 years ago he had cause to travel County Road 430 for about a 6–8 month period. In doing so, he passed the area of the disputed road daily. Mr. Calvert testified while there was an area where one could exit from County Road 430 onto Defendants' property it did not appear to be a road and he certainly never saw anyone on it. Mr. Calvert did not know the condition of this area 20 to 30 feet away from County Road 430. The realtor who had the Weaver property listed for five years, Lee Fesmire, also testified. Mr. Fesmire's first contact with the property was in 2002 or 2003. He then drove a four-wheeler down to the Weaver's property line and back. According to him, the disputed road was all grown up at this time. On a visit Christmas 2005, he noticed someone had taken a dozer and cleared the land. Mr. Fesmire was aware the Weavers had not done this work.

According to both Defendant, Joseph Cook and Tommy Hollowell, the disputed road is no more than a trail which is passable, at best, only with a four-wheeler. Within the roadway are saplings growing which would destroy a car. It must be noted that Mr. Hollowell's knowledge of the disputed road commences with the date of purchase by the Cooks. Prior to that date he was only aware of the condition of the disputed road as could be seen from County Road 430.

## Discussion

From the testimony, the trial court concluded that appellee's "use may not have been on a weekly basis, [but] it was frequent enough to be adverse to the interests of the owners," and that appellee "has done some maintenance of this road which again makes it clear that an interest adverse to the interests of the owner, is being exercised"; the trial court enjoined appellants from blocking appellee's access to his property. We find clear error in the trial court's assessment of the evidence.

It is well established that where there is passage over property that is unenclosed, uninhabited, and unimproved, there is a presumption that such use is permissive, and not adverse; that use which is permissive in its inception can never ripen into an adverse or hostile right no matter how long continued unless the statutory period has elapsed after notice of the adverse claim has been brought home to the owner; and that some act or circumstance, in addition to, or in connection with, the use of a way across the unenclosed lands of another and tending to indicate that the use was not merely permissive is required to establish a right by prescription.

Here, while appellee presented testimony that he and family members often used appellants' property to access their own, such use is presumed permissive. The only evidence that went beyond this "use" involved maintenance of the roadway. Even so, the testimony regarding the bulldozing of the roadway in 1993 or 1994 was not sufficient to bring home to appellants' predecessors the fact that appellee was making an adverse claim to the roadway. At that time, it took the dozer operator only three to four hours to complete his work, and he acknowledged that it was something of a stop-gap measure and that unless more was done the road would wash out every year during the wet season. Thereafter, the annual efforts to fill in the washed out areas were similarly "stopgap" measures. The only testimony that could be regarded as bringing home an adverse, rather than permissive, use of appellee's passage over appellants' proper-

ty occurred in 2005 (prior to appellants' purchase) when the logging company widened the road and dramatically altered its appearance—visible even from the county road. But, even that act was not permanent, and more importantly, the requisite period of time to establish adverse use, seven years, was not possible to achieve between the 2005 widening of the road and the time that appellants put their gate in place and this action was commenced by appellee. We are left with a definite and firm conviction that the trial court was mistaken in concluding that appellee established a prescriptive easement over appellants' property.

Reversed.

KINARD and MARSHALL, JJ., agree.